UNITED STATES DISTRICT COURT
NOTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13 CR 951 |
| v. | ) | |
| | ) | Hon. Robert M. Dow, Jr. |
| LAURANCE H. FREED and | ) | |
| CAROLINE WALTERS | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANTS' CONSOLIDATED
MOTION TO DISMISS OR STRIKE CERTAIN COUNTS AND
ALLEGATIONS OF THE SUPERSEDING INDICTMENT**

The government hereby responds to defendants' consolidated motions to dismiss certain counts and to strike certain allegations of the superseding indictment against them:

## INTRODUCTION

Defendants are charged in a superseding indictment with engaging in schemes to defraud banks and other entities and with making false statements to banks. At the heart of defendants' conduct was their desire to maintain their business entities' access to badly needed cash for real estate development. To accomplish that goal, defendants hid from banks and from the City of Chicago the fact that their businesses were in default on a redevelopment agreement with the City of Chicago and thus were not entitled to significant TIF funds from the City of Chicago, and they

misrepresented to banks the value of certain properties they had posted as collateral for loans in order to secure financing.

Defendants' motion is premised primarily on their misunderstanding of the alleged scheme. They argue that two separate schemes—one against the bank consortium and one against Kimco Realty—improperly have been joined in order to loop a scheme against Kimco Realty into a scheme against the banks to avoid the five-year statute of limitations on wire fraud. In fact, as explained below, the superseding indictment alleges that defendants' deception of Kimco Realty was an integral aspect of their efforts to deceive the banks.

Specifically, defendants intentionally overstated to the banks the value of collateral they had diminished through their unauthorized and deceptive removal of funds from the joint venture with Kimco Realty. The scheme to defraud Kimco is properly charged as affecting a financial institution because the diminished value of the property pledged to the banks as collateral increased the risk to the banks and thus "affected" a financial institution.

Finally, the City of Chicago properly was listed as a victim of the wire fraud scheme because the superseding indictment alleges that the City of Chicago had no obligation to make TIF payments in the event of a default by defendants' entities, and in an effort to continue receiving TIF funds the

2

defendants' hid from the City of Chicago that their entities were in default on the Redevelopment Agreement.

## ALLEGATIONS OF THE SUPERSEDING INDICTMENT

The following allegations of the superseding indictment are pertinent to defendants' motion to dismiss and strike:

**1.     Uptown Goldblatts' Redevelopment Agreement with the City of Chicago and the TIF Notes**

Defendant JOSEPH FREED was the President of JFA, a real estate development company, and defendant CAROLINE WALTERS was JFA's Vice-President and Treasurer. In November 2002, Uptown Goldblatts, which was a limited liability company formed by JFA and managed by FREED, entered into a Redevelopment Agreement with the City of Chicago. Superseding Indictment ("Sup. Ind."), ¶ 1 (b), (e). Pursuant to this Redevelopment Agreement, the City issued two Tax Increment Financing (TIF) notes to finance the Uptown Goldblatts redevelopment project. Sup. Ind. ¶ 1(e).

In the Redevelopment Agreement, Uptown Goldblatt's promised that it would guarantee the satisfaction of certain conditions in order to receive TIF payments from the City. Sup. Ind. ¶ 1(f). Among the conditions it guaranteed was it that it was not in default with respect to any agreement related to the borrowing of money. *Id*. Uptown Goldblatts was required to

3

certify in annual affidavits that it was not in default of any of the promises it had made in the Redevelopment Agreement. Sup. Ind. ¶ 1(g). The Redevelopment Agreement provided that if an event of default occurred, then the City would no longer be obligated to make any TIF payments. Sup. Ind. ¶ 1(f).

### 2. Cole Taylor Bank's Loan to Uptown Goldblatts and the First TIF Project Note Pledge

At about the same time it entered into the Redevelopment Agreement with the City, Uptown Goldblatts entered into an agreement with Cole Taylor Bank in which Cole Taylor Bank agreed to lend $15,000,000 to Uptown Goldblatts in exchange for Uptown Goldblatts' assignment to Cole Taylor Bank of its rights in and to the TIF Project Note. Sup. Ind. ¶ 1(h).[1] As part of its agreement with Cole Taylor Bank, Uptown Goldblatts would receive the TIF payments to which it otherwise was entitled unless Uptown Goldblatts was in default of the agreement with Cole Taylor Bank, in which case Cole Taylor Bank was instead entitled to the TIF Project Note payments. *Id.* The agreement with Cole Tylor Bank forbade Uptown Goldblatts from permitting any liens or security interests being placed on the collateral for the loan, including the TIF Project Note. *Id.*

---

[1] The amount of the loan was later reduced to $9,000,000. Sup. Ind. ¶ 1(h).

4

### 3. Creation of the Joint Venture With Kimco Realty

In August 2003, Freed Schaumburg LLC, which was an entity formed by JFA, and Kimco Schaumburg, Inc., which was an entity formed by Kimco Realty, formed a joint venture called KF Schaumburg LLC. Sup. Ind. ¶ 1(c). Freed Schaumburg owned 55 percent of a shopping center called Streets of Woodfield; Kimco Schaumburg owned 45 percent of Streets of Woodfield. *Id.* The operating agreement for the joint venture provided that all cash available for distribution from the joint venture would be distributed not less than quarterly and in proportion to their ownership interests in Streets of Woodfield. Sup. Ind. ¶ 1(d). The operating agreement also provided that neither party could pledge or grant an interest in the ownership, management, voting, or other rights related to the party's ownership interest. *Id.*

### 4. Second Pledge of TIF Project Note and The Pledges of Additional Properties, Including An Interest in the Joint Venture With Kimco, In Return For Additional Financing

In May 2006, entities associated with JFA entered into agreements with a consortium of banks that provided them with a revolving line of credit of up to about $150,000,000. Sup. Ind. ¶ 1(i). In exchange for this line of credit, the JFA entities pledged collateral that included properties known as Evanston Plaza and West Town Center, and FREED personally guaranteed the loan for up to $50,000,000. *Id.* In July 2007, entities associated with JFA

5

made additional agreements with the bank consortium, including a supplement to the revolving loan agreement. Sup. Ind. ¶ 1(j). Freed Schaumburg pledged as collateral for the line of credit its membership interests in the Streets of Woodfield joint venture, including its interest to participate in the management and voting of the joint venture. *Id.*

In November 2007, Uptown Goldblatts entered into a security agreement with LaSalle Bank (recently having been acquired by Bank of America), acting on behalf of the bank consortium, in which Uptown Goldblatts became a borrower under the previously executed loan agreement between the JFA entities and the bank consortium. Sup. Ind. ¶ 1(k). As part of this security agreement, Uptown Goldblatts pledged both TIF notes as collateral for the line of credit and warranted to the bank consortium that the collateral was owned free and clear other than the security interests held by Uptown Goldblatts. *Id.* Uptown Goldblatts made this representation to the bank consortium despite FREED's and WALTERS' knowledge that the TIF Project Note previously had been pledged to Cole Taylor Bank. *Id.*

5. **Additional False Statements Made to the Banks About the Value of the Pledged Collateral**

In the ensuing months, FREED and WALTERS made false statements to the bank consortium concerning the value of collateral the JFA businesses had pledged to the bank consortium. In November 2008, WALTERS sent to

the bank consortium a cash flow projection that, among other things, falsely represented the value of the TIF Project Note by hiding from the bank consortium the fact that the note already had been pledged to Cole Taylor Bank, which had a superior interest in the note. Sup. Ind. ¶ 5. On multiple occasions between December 2008 and July 2009, FREED and WALTERS made presentations to the bank consortium that contained false statements about the true ownership interests in and value of the TIF notes. Sup. Ind. ¶ 6. During the same presentations in December 2008 and April 2009, FREED and WALTERS falsely represented to the bank consortium the value of Evanston Plaza and West Town Center, both of which the JFA businesses had pledged as collateral to the bank consortium. Sup. Ind. ¶¶ 7-8. Specifically, they knowingly understated the true projected debt and cost of sale of these two pledged properties by hiding from the bank consortium the fact that significant property taxes were owed on those two properties. *Id.*

During the same presentations to the bank consortium in December 2008, January 2009 and April 2009, FREED and WALTERS made false statements to the bank consortium concerning the value of the Streets of Woodfield property that was the subject of the joint venture between Freed Schaumburg and Kimco Schaumburg. Sup. Ind. ¶ 9. Specifically, they misrepresented the projected debt, cost of sale, and proceeds of the sale of Streets Woodfield in order to make the projected proceeds of a sale of Streets

7

of Woodfield seem higher than they really were. *Id.* FREED knew at the time of these presentations that the figures were wrong because beginning no later than November 2007, he already had caused JFA employees to transfer funds from the bank accounts of the Streets of Woodfield joint venture and to conceal those transfers from Kimco. *Id.*

> **6. False Representations to the City of Chicago About the Status of the TIF Project Note in Order to Obtain TIF Payments**

In December 2008, December 2009, and December 2010, FREED signed affidavits submitted to the City of Chicago in support of his requests for disbursements of TIF payments. Sup. Ind. ¶ 10-11. He falsely stated in those affidavits that Uptown Goldblatts was not in default under the Redevelopment Agreement even though he knew it was in default because, among other things, the TIF Project Note had been double-pledged to Cole Taylor Bank and the bank consortium. Sup. Ind. ¶10. FREED caused those false affidavits to be sent to the City in order to obtain TIF payments to which Uptown Goldblatts was not entitled. Sup. Ind. ¶¶ 10-11.

## ARGUMENT

An indictment is legally sufficient if (1) it states the elements of the crime charged, (2) adequately informs the defendant of the nature of the charges, and (3) allows the defendant to assert the judgment as a bar to future prosecutions of the same offense. *United States v. Vaughn*, 722 F.3d

8

918, 925 (7th Cir. 2013). "To successfully challenge the sufficiency of an indictment, a defendant must demonstrate that the indictment did not satisfy one or more of the required elements and that he suffered prejudice from the alleged deficiency." *Id.*; *United States v. Johnson*, 2015 WL 1058087, at *2 (N.D.Ill March 5, 2015). An indictment can be attacked on constitutional grounds, but "[t]he test for validity is not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." *United States v. Vaughn*, 722 F.3d at 925 (*quoting United States v. Hausmann*, 345 F.3d 952, 955 (7th Cir. 2003)). When considering a motion to dismiss an indictment, all the facts alleged in the indictment are assumed to be true and are to be viewed in the light most favorable to the government. *United States v. Johnson*, 2015 WL 1058087, at *2; *United States v. Pu*, 15 F. Supp. 3d 846, 849 (N.D.Ill. 2014).

**I. Count 9 of the Superseding Indictment Charges Only One Scheme and Is Not Duplicitous, and the Execution of the Scheme is Within the Applicable Statute of Limitations.**

The scheme charged in Count 9 of the superseding indictment properly charges only one scheme. The superseding indictment alleges that while the JFA business was entitled to 55% of the joint venture's available cash for distribution, defendants defrauded their joint venture partner by surreptitiously taking money from the joint venture and concealing those transfers from Kimco. Sup. Ind. ¶¶ 1(c), (d), and 9. By April 30, 2009, the

9

joint venture owed Kimco at least $3,589,252 as a result of funds FREED had caused to be transferred and then, along with WALTERS, had concealed from Kimco. Sup. Ind. ¶ 9.

Defendants' scheme to defraud Kimco by surreptitiously taking money from the joint venture affected financial institutions because it resulted in a devaluing of the collateral pledged to the bank consortium—a value that defendants overstated in their presentations to the bank consortium. Specifically, when defendants made presentations to the bank consortium in December 2008, January 2009, and April 2009, in connection with financing the JFA entities received from the bank consortium, they understated Streets of Woodfield's (the joint venture) projected debt, cost of sale, and proceeds of sale. Sup. Ind. ¶ 9. Their false understatement of these figures was significant and affected the bank consortium because Streets of Woodfield had been pledged to these financial institutions as collateral for financing the JFA entities. *Id.*

The bank presentations in which defendants made false statements regarding Streets of Woodfield are the same bank presentations in which defendants made false statements about the TIF notes, Evanston Plaza, and West Town Center. Defendants made false statements regarding Streets of Woodfield in the *same* presentations to the *same* victims regarding the *same*

10

bank loan on the *same* days as the false statements charged in the original indictment.

A scheme to defraud affects a financial institution if the scheme has a "direct negative impact on the institution." *United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003). Such an impact includes exposing the institution to new or increased risk of loss. *Id.* *See also United States v. Marr*, 760 F.3d 733, 744 (7th Cir. 2014). For a scheme to have affected a financial institution, it is not necessary to prove that the institution suffered a loss, or even that the defendant intended to defraud the institution. *See United States v. Marr*, 760 F.3d at 744; *United States v. Serpico*, 320 F.3d at 694.

In the present case, defendants' scheme to defraud Kimco by taking unauthorized amounts of money from the joint venture affected the financial institutions because it diminished the value of collateral pledged to them, placing those financial institutions at increased risk in the event of JFA's default on the loans from the consortium. As a result, the scheme charged in Count 9 properly alleges that it affected a financial institution and is subject to a 10-year statute of limitations. 18 U.S.C. § 3293(2). There appears to be no dispute that if the 10-year statute of limitations applies the charge is timely.

Defendant's argument that the scheme charged in Count 9 is duplicitous is without merit. A count is duplicitous if it charges more than

11

one offense. *United States v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006). But a count is not duplicitous where one offense is alleged even though several different acts are specified. *United States v. Zeidman*, 540 F.2d 314, 316 (7th Cir. 1976). *See also United States v. Davis*, 471 F.3d at 790.

As explained above, Count 9 charges a scheme to defraud Kimco which affected financial institutions by virtue of diminishing the value of collateral pledged to them. There is nothing about this charged scheme that is any different from any other scheme to defraud that affects a financial institution. The fact that defendants compounded the fraud by then misrepresenting *to the financial institutions themselves* the status of the collateral they had diminished by virtue of the fraud against Kimco makes it even more appropriate that this scheme be charged the way it is and that it be brought as part of the same indictment that charges defendants' other frauds against these same financial institutions.

Defendants' argument that the charged execution of the scheme against Kimco was not in furtherance of the scheme is without merit. The charged execution of the scheme to defraud Kimco in Count 9 is an email WALTERS sent to Kimco's Chief Executive Officer on June 7, 2010. The superseding indictment alleges that the charged email was sent for the purpose of delaying action by Kimco Schaumburg that would have prevented FREED and WALTERS from taking more cash from the joint venture. Sup.

12

Ind., Count 9, ¶ 4. Wire communications that lull a victim into a false sense of security after the victim's money already has been taken or that assist the defendant in avoiding detection may be sufficient to further a scheme. *United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009). Here, defendants are alleged to have tried to convince Kimco not to take action that would prevent defendants from removing further funds from the joint venture. Sup. Ind., Count 9, ¶ 4.

The fact that a victim of a fraudulent scheme has become aware of the scheme does not mean the scheme's perpetrator is not criminally liable for attempting further action to lull the victim into complacency. In *United States v. McGowan*, *supra*, a victim of a fraudulent scheme by an investment advisor became aware of the defendant's scheme and reported it to law enforcement authorities. Under the direction of law enforcement authorities, the victim made consensually recorded phone calls to the defendant in which the defendant lied to the victim about the status of her investments. *McGowan*, 590 F.3d at 449. Those lulling phone calls were the only charged executions of the scheme occurring within five years of the indictment. The defendant moved to dismiss those counts on the ground that they were barred by the statute of limitations, but the district court denied his motion. The Seventh Circuit affirmed the district court's denial of the motion to dismiss, concluding that lulling calls being made after the victim became

13

aware of the fraud was not determinative of whether those calls were executions of the scheme.

> Rather, the relevant question is whether the wire communication "is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the [wire communication] later, through hindsight, may prove to have been counter-productive and return to haunt the perpetrator of the fraud." (*quoting Schmuck v. United States*, 489 U.S. 705, 715 (1989)).

*United States v. McGowan*, 590 F.3d at 457.

In this case, the superseding indictment alleges that defendants caused the lulling email to be sent to Kimco's CEO in order to forestall efforts by Kimco to prevent the further improper depletion of joint venture funds. That allegation is sufficient to sustain the count, particularly where the allegations of an indictment are presumed to be true, and a jury can decide whether the email did in fact lull Kimco. Even looking at the wire fraud scheme in Count 9 without the additional allegation of "affecting a financial institution," the charged execution (June 7, 2010) occurred within *five* years of the superseding indictment (April 16, 2015).

## II.   Paragraph 9 of Count 1 is Properly Alleged and Should Not be Stricken

The allegation contained in paragraph 9 of Count 1 is facially valid and an integral part of the charged schemes. Paragraph 9 charges that defendants falsely represented to the bank consortium the value of Streets of Woodfield, which was one of the properties pledged as collateral to the bank

14

consortium. In Section III of their motion, defendants do not suggest that falsely representing the value of collateral to the bank consortium would not, if proven, be fraudulent. Instead, they quibble over who owes money to whom, arguing that if defendants improperly took money from the joint venture, then money was owed *to* the joint venture, rather *by* the joint venture. Their argument is wholly without merit.

The charged scheme alleges that defendants surreptitiously took money from the joint venture. Sup. Ind. ¶ 9. Taking that money depleted the value of the joint venture. By April 30, 2009, more than $3 million that should have gone to Kimco had instead gone to JFA businesses. *Id.* Whether one characterizes it as JFA owing the money back to the joint venture or the joint venture owing the money to Kimco is a matter of hair-splitting; if one concludes the joint venture is owed money from JFA, then what follows is that the money is then in turn owed by the joint venture to Kimco. Either way the debt is characterized, the value of the joint venture was not accurately represented to the bank consortium because defendants failed to apprise them that the joint venture's books do not reflect that Kimco is owed more proceeds from the joint venture. When viewing the alleged facts in a light most favorable to the government, paragraph 9 of Count 1 is facially valid and should not be stricken.

## III. The City of Chicago Is Properly Alleged as a Victim in Count 8

The City of Chicago is properly named as a victim in Count 8 of the superseding indictment. The superseding indictment explains that "TIF notes were conditional grants of taxpayer funds to a specific project development that the Chicago City Council had approved." Sup. Ind. ¶ 1(e). It alleges that under the Redevelopment Agreement, Uptown Goldblatts was required upon the disbursement of TIF funds to guarantee that certain conditions would be met, including that it was not in default with respect to any agreement related to the borrowing of money. Sup. Ind. ¶ 1(f). It also alleges that the City was not obligated to make TIF payments if Uptown Goldblatts failed to keep any of its promises and was in default under the Redevelopment Agreement. *Id.*

> The Redevelopment Agreement provided that if an event of default occurred—including a failure by Uptown Goldblatts to keep any of these promises—the City of Chicago would no longer be obligated to make TIF payments.

Sup. Ind. ¶ 1(f). The plain language of the superseding indictment alleges that the City was not obligated to pay *any* TIF money in the event of a default, regardless whether Uptown Goldblatts or Cole Taylor Bank had a superior right as between them to any TIF funds after the TIF funds had been disbursed.

16

The superseding indictment alleges that Uptown Goldblatts was in default of the Redevelopment Agreement by double-pledging the TIF Project Note, and, therefore, that FREED's affidavits swearing that no condition of default existed were false. Sup. Ind. ¶ 10. Defendants' argument that the superseding indictment alleges the bank consortium and Cole Taylor were entitled to the TIF payments (Sup. Ind. ¶ ¶ 10-11) focuses on who between Uptown Goldblatts and the banks had a superior right to any TIF funds that were disbursed, but ignores the allegation that the City was not obligated to make *any* TIF payments in the event of default. *See* Sup. Ind. ¶ 10 ("FREED signed affidavits that he knew were false in order to obtain TIF payments from the City of Chicago."); Sup. Ind. ¶ 11 (Defendants caused false requisition forms and affidavits "to be sent to the City of Chicago for the purpose of obtaining TIF payments."). The allegation that Cole Taylor Bank and the bank consortium had a superior right to the money emphasizes that the TIF Project Note was double-pledged, which constituted an event of default and meant that the City was not obligated to pay TIF funds to anyone. The allegation that the City was a victim of the scheme because it paid TIF funds that it was not required to pay is facially valid.

## CONCLUSION

For the foregoing reasons, defendants' consolidated motion to dismiss and to strike should be denied.

                         Respectfully submitted,

                         ZACHARY T. FARDON
                         United States Attorney


By:   RENATO MARIOTTI
        Assistant United States Attorney
        219 South Dearborn Street
        Chicago, IL  60604
        (312) 886-7855