**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 13 CR 951 |
| v. | Honorable Robert M. Dow, Jr. |
| LAURANCE H. FREED and CAROLINE WALTERS. | |

**DEFENDANTS' MOTION TO COMPEL
BANK OF AMERICA TO COMPLY WITH RULE 17(c) SUBPOENA**

Defendants Laurance H. Freed and Caroline Walters move, under Rule 17(c) of the

Federal Rules of Criminal Procedure, for an order compelling Bank of America, N.A. ("BoA"),

to comply with the subpoena *duces tecum* served on it.  In the nine months since service, BoA

has not produced a single page required under the subpoena.  And now, although its current

officers and employees will be key witnesses for the government at trial, and although the

government's bank fraud charge virtually mirrors the civil fraud lawsuit BoA instigated, BoA

asserts that compliance with its civic duty to produce material evidence in a criminal matter

would be too onerous for it.  BoA's protests cannot stand.  The requested matter is essential to

defendants' ability to contest the government's allegations, and it is narrowly tailored to

accomplish that goal.  The Court should order BoA to comply.

I.      Background

The core of the government's indictment is an alleged scheme by defendants to defraud

BoA in connection with an existing $105 million line of credit to Freed's real estate businesses.

In particular, beginning in late 2008, defendants allegedly made a series of presentations to BoA

requesting that the bank increase the existing line of credit by $10 million.  (*See* Sup. Indict., ¶¶

4-8.)  And, although that request was never granted, the government alleges that the

presentations were fraudulent because they omitted certain material facts. One of those facts was defendants' alleged recent discovery that a piece of collateral previously pledged to BoA – the UGV TIF note, with a face value of $2.4 million – had been pledged even earlier to a different lender. (*Id.* at 4-6.) The indictment also alleges that the presentations to BoA failed to disclose that two other pieces of collateral were delinquent on their payment of real estate taxes, namely West Town Center and Evanston Plaza. (*Id.* at 7-8.)

In an effort to prove that scheme, the government will apparently rely on the testimony of multiple witnesses from BoA, most notably Gary Katunas. Katunas – who submitted to a voluntary interview with the government – is the Senior Vice President of BoA's Special Assets Group, and he was the primary bank officer managing the relationships and credit facilities with the Freed-affiliated entities. The government will elicit testimony from Katunas and one or more other BoA witnesses as to the supposed significance to BoA of the collateral identified above and of defendants' alleged failure to disclose in their presentations to BoA the supposed issues with those pieces of collateral.

BoA's cooperation with – indeed, encouragement of – the government's investigation of Freed included its production of tens of thousands of pages of documents to the government. Although the government's discovery production to defendants included numerous emails between BoA and outsiders like defendants, it curiously contained no email communications solely between or among BoA personnel. None of BoA's production to the government thus reveals any communications within BoA concerning those pieces of collateral.

2

Defendants thus were obliged to issue a Rule 17(c) subpoena to BoA on February 20, 2015. (*See* Exhibit 1, attached.)[1]  In requesting BoA's communications concerning the testimonial subjects identified above, defendants specifically excluded any documents that had already been produced to the government.  After BoA's Chicago-based counsel refused the courtesy of accepting service of the subpoena on behalf of his client, defendants caused formal service to be made on BoA's subpoena compliance department in upstate New York. On March 18, 2015, another of BoA's counsel (the partner of the lawyer who previously declined to accept service) called Freed's counsel and acknowledged that his client had been served.  (*See* Email Chain between C. Robertson and C. Rubenstein, attached as Exhibit 3, pp. 10-11.)  The next day, BoA's counsel requested defendants to "identify specific custodians as to whom the email search would be conducted and the time frame of the search, in addition to any search terms that you would request be used."  (*Id.*)  Defendants responded the following Monday by: (1) agreeing to further limit the time frame; (2) identifying four custodians as requested; and (3) providing the suggested search terms – terms that were highly-specific and narrowly-tailored to comply with the subpoena.  (*Id.* at p. 9.)

In mid-April, BoA's counsel stated that BoA had researched the issue and that BoA was claiming to have technical challenges with obtaining the emails for two of the four custodians that had been identified.  Those asserted challenges related to the fact that those custodians had been employees of LaSalle Bank prior to its merger with BoA, and that obtaining their emails would be prohibitively expensive because they were not on BoA's email system.  (Importantly,

---

[1]As discussed below, defendants have since reissued that subpoena, at BoA's suggestion, with even more narrowly-drafted requests, limiting it to four specified custodians, and an even shorter time period. (*See* Exhibit 2, attached.)

Katunas had always been an employee of BoA.)  Freed's counsel requested that BoA's counsel go back to his client to find out what it would entail, at least as a first step, to retrieve the emails for the two custodians on the BoA system, including Katunas.

On April 16, the government filed its superseding indictment, adding allegations concerning another piece of collateral pledged to BoA relating to the Streets of Woodfield retail center.  The government alleges that the presentations to BoA requesting an increase in the line of credit also contained material omissions or misrepresentations concerning the Streets of Woodfield, particularly as to the amount of debt owed by that venture to third parties ($82 million in debt instead of an alleged $85 million).  (*See* Sup. Indict, ¶ 9.)

Because of those new allegations, the existing trial date was struck and moved to February 2016.  (*See* Dkt. 51.)  On June 23, 2015, still having received no response from BoA to the subpoena, Freed's counsel wrote again to ask about the status of the response and, particularly, BoA's ability to produce the emails at least for the identified custodians.  (*See* Exh. 3, p. 5.)  On July 15, 2015, still having received no substantive response, Freed's counsel wrote yet again to ask for an answer.  (*Id.* at pp. 3-4.)  In a call later that day, BoA's counsel stated that he needed to revisit with his client the technological issues that BoA claimed to have.  Two weeks later, having received no response, Freed's counsel pressed again: "Any update on this?" (*Id.* at p.3.)  And after another five weeks of silence: "I still have not heard from you.  Please let me know where we stand."  (*Id.*)  And then on October 23, with still no response from BoA: "Another six weeks have passed.  Please don't make me file a motion.  Call me."  (*Id.* at p. 2.)

BoA's counsel finally responded, "I have made little progress so possibly reissuing the subpoena or a motion may be the way to go.  But let me confirm on Monday."  (*See* Exhibit 4,

p. 2.)  BoA did confirm by email on that Monday, November 2, claiming for the first time that

the subpoena was "jurisdictionally improper" and was "improper due to its breadth and failure to

meet the required specificity under Rule 17."  (*See* Exhibit 3, p. 1.)  While refusing to produce

*any* of Katunas's emails, BoA purported to propose an "accommodation" by agreeing to produce

a handful of emails for the other custodians for exceptionally brief time periods (one for a single

month in 2007 and the others all *ending* in 2008, many months *before* any of the allegedly

fraudulent presentations were made to BoA).  When Freed's counsel questioned how BoA chose

those apparently arbitrary time periods and why it chose to exclude Katunas's emails entirely,

BoA was again silent.  (*Id.* at p. 1.)

    As BoA's counsel had earlier suggested, defendants consequently reissued the subpoena

on November 4, 2015, formalizing their agreement from March to limit the subpoena to the four

custodians and time period that defendants had proposed.  (*See* Exh. 2.)  That subpoena was even

more narrowly drafted than the initial subpoena.[2]  In particular, it is limited to all non-privileged

internal emails for the four custodians relating to the credit decision concerning the proposed

increase in the line of credit, and the collateral for that line of credit (most importantly, the UGV

TIF notes and the Streets of Woodfield).  (*Id.* at ¶ 1.)  The subpoena also requests:  the BoA

internal emails regarding the presentations that defendants made to BoA, as alleged in Count

---

[2]In addition, out of an abundance of caution, the reissued subpoena addressed the claimed "jurisdictional" issue.  In particular, the caption for the original subpoena listed the Northern District of New York, the venue in which BoA's subpoena compliance department was located. That mistake, however, was immediately noted when Freed's counsel wrote to BoA's counsel on March 18, 2015, that "as we discussed, [the subpoena] has an error in the caption for NDNY instead of NDIll – let me know if you need a new subpoena with the corrected caption)."  BoA's counsel responded the next day asking for a list of custodians and search terms, never suggesting that a new subpoena need be issued.

One of the indictment, the discovery of the double pledge of the project note, and the real estate taxes owed by Evanston Plaza and West Town.  (*Id.* at ¶¶ 2, 3, 5.)  Lastly, the subpoena seeks the bank account records for the lockbox to which the payments under the UGV TIF notes were to be made.  (*Id.* at ¶ 4.)

At defendants' request, counsel for both parties had a "meet and confer" conference call on November 23, 2015.  During that call, BoA's counsel stated that the data for all four custodians for the time period in the subpoena had already been captured and imaged, totaling approximately 76 gigs, and that the "only issue" remaining was the cost of processing that data. Yet, BoA refuses to produce the emails required by the subpoena unless defendants pay for BoA's cost.  Because it is not defendants' responsibility to pay for the cost of production in response to a valid, reasonably-drawn subpoena calling for material critical to defending themselves, defendants bring this motion.

II.     The Validly-Issued and Sufficiently-Specific Subpoena Poses No Undue Burden on BoA and Must be Enforced.

A third party's duty to produce evidence in criminal proceedings has long been recognized as "a basic obligation that every citizen owes his Government." *United States v. Calandra*, 414 U.S. 338, 345 (1974).  Courts have described this duty as "almost absolute," *Second National Bank of North Miami v. United States* 555 F.2d 1306, 1309 (5th Cir. 1977), and have applied it to corporate entities as easily as to individuals.  *See In re Grand Jury Subpoena Duces Tecum Issued to First Nat. Bank of Maryland Dated Nov. 4, 1976*, 436 F. Supp. 46, 50 (D. Md. 1977).  A defendant's right to "compulsory process" of evidence from third parties extends to documentary as well as testimonial evidence, and it is effected through Rule 17(c) of the Federal Rules of Criminal Procedure.

6

To require production under a Rule 17(c) subpoena, all that is necessary is:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

*United States v. Nixon*, 418 U.S 683, 699-700 (1974). In complying with these requirements, "[i]t is not necessary that a subpoena designate each particular paper desired. Designation of kinds of documents with reasonable particularity will suffice." *United States v. McCollum*, 651 F.Supp. 1217, 1224 (N.D.Ill. 1987). Additionally, "the materials subpoenaed need not actually be used in evidence," as long as the subpoena constituted a "good-faith effort . . . to obtain evidence." *Id.*

Defendants' subpoena is a "good faith effort to obtain evidence" necessary to their defense. In particular, as is apparent from the government's investigation and BoA's cooperation as an alleged victim in that investigation, much of the trial will center on the testimony of BoA's own officer and/or employees, particularly Katunas. Those employees' contemporaneous communications – not their after-the-fact opinions at trial – will be essential in rebutting their testimony and the government's charges. For example, the emails surrounding defendants' presentations to BoA will contradict the allegations that those presentations contained misleading omissions or representations. The alleged significance of the UGV TIF note to the requested increase in the line of credit will also be refuted by the candid communications reflected in those internal emails. (Of course, BoA never granted the requested increase.) Likewise, the witnesses' internal communications concerning the real estate taxes

7

owed by the Evanston Plaza and West Town Center developments will be admissible evidence to rebut the testimony of the BoA witnesses, particularly by showing that the arrearages had, in fact, been *disclosed* to those witnesses and were thus not intended to defraud anybody. Similarly, with respect to the Streets of Woodfield, the subpoena narrowly seeks documents to rebut the allegation that defendants' presentations to BoA intentionally understated that development's debt of $3 million ($82 million compared to its actual alleged debt of $85 million), again reflecting that all material information had, in fact, been *disclosed* to BoA. Lastly, the account records for the lockbox (for proceeds of the UGV TIF note) are admissible business records necessary to demonstrate that there was no effort to deceive BoA – which had complete access to all of that account information – concerning what funds did or did not go through that account.

It is no response to the above for BoA to complain that the subpoena does not identify particular individual emails. Of course, because defendants have no access to those documents, they cannot identify them at that granular level. Nor is that level of detail required. See *McCollum*, 651 F.Supp. at 1224. It is enough that defendants have designated "kinds of documents with reasonable particularity." *Id.* It would not be reasonable to expect more, especially where the business transactions at issue were complex, involving numerous people over an extended period of time. Indeed, as observed in one of the cases cited by BoA, "the proponent of a subpoena cannot be expected to identify the materials he seeks in exacting detail, when (as demonstrated by the fact that he must employ a subpoena) he does not have access to them." *United States v. Reyes*, 239 F.R.D. 591, 599 (N.D.Cal. 2006). Defendants' agreement here to limit the subpoena to a handful of the key witnesses over a defined time period involving

only the particular transactions and false statements alleged in the indictment, is all that is required.

BoA's vague complaint that the subpoena is insufficiently specific under Rule 17(c) is not supported by any of the cases it cited in its November 2 email. In one, for example, the defendant broadly requested documents relating to transactions that had nothing to do with those charged in the indictment, with no limitations concerning the subject matter of the emails sought. *Cf. United States v. Mullins*, 2013 WL 3506547, No. 12CR596 (N.D. Ill. July 11, 2013). Here, in contrast, the requests are explicitly limited to the narrow subject matters at issue, and they seek directly admissible evidence rebutting the government's charges and the witnesses' expected testimony concerning particular elements of the offense. *Cf. also United States v. West*, 2010 WL 4386696, No. 08CR669 (N.D. Ill. Oct. 26, 2010) (defendants made no argument that the requested records could be admissible at trial); *Reyes, supra*, 239 F.R.D. at 599 (seeking documents that are inadmissible hearsay and irrelevant to the offense).

Finally, the subpoena poses no undue or unusual burden on BoA. Criminal defendants are entitled to "everyman's evidence" under the Sixth Amendment. As citizens, we all have a civic duty (subject to applicable privileges) to produce information necessary for an accused to defend himself against the government's efforts to take his liberty. No less for BoA – the alleged victim of the offense, who has cooperated with and encouraged the investigation leading to those charges. Satisfying that duty always bears a cost, whether it is an individual's time away from work to provide oral testimony, or a business's effort to retrieve and produce documents. That small sacrifice is certainly no less important in a criminal case than it would be in a commercial dispute. BoA does not dispute its duty. Nor does it contend that it would be

infeasible to retrieve the requested emails. To the contrary, it acknowledges having already compiled and segregated the emails for the four custodians at issue – 76 gigabytes worth (about one iPhone's worth of data). Yet BoA, with its market capitalization of $183 billion[3], refuses to comply with its duty unless defendants pay the bill. There is no justification for BoA to hold defendants hostage with that demand.

III.     Conclusion

    Defendants' original and now-reissued subpoenas were issued in a good faith effort to defend themselves in a complex matter involving serious allegations of fraud. Over the last nine months, their counsel have made repeated but futile attempts to gain compliance with even a part of that subpoena, before seeking the Court's recourse. But BoA – which has been an adversary to them as much as the government since long before the investigation began – has refused to comply in any meaningful way. Defendants have articulated the proper and important reasons for the requested materials. They are not involved in a "fishing expedition," but a targeted effort to rebut particular charges. The subpoena poses no unusual or unreasonable burden. Defendants thus respectfully request the Court to order BoA to comply with the subpoena by a date sufficiently in advance of trial for the parties to make use of those materials in preparing for trial.

---

[3]http://finance.yahoo.com/q;_ylt=AwrBT7yDYFNWr.wADd1XNyoA;_ylu=X3oDMTEx czB2MGI1BGNvbG8DYmYxBHBvcwMyBHZ0aWQDVUlDMV8xBHNlYwNzcg--?s=BAC.

Dated: November 24, 2015


Respectfully submitted,                          Respectfully submitted,
LAURANCE H. FREED                                CAROLINE WALTERS


By: /s/ Corey B. Rubenstein                      By: /s/ Thomas K. McQueen
      One of His Attorneys                             One of Her Attorneys

Mark L. Rotert                                   Thomas K. McQueen
Corey B. Rubenstein                              Law Offices of Thomas K. McQueen, P.C.
Andrea C. Halverson                              41 S. Wynstone Dr.
STETLER, DUFFY & ROTERT, LTD.                    North Barrington, IL 60010
10 S. LaSalle Street                             tkm@tmcqueenlaw.com
Suite 2800
Chicago, Illinois 60603
(312) 338-0200
mrotert@sdrlegal.com
cruben@sdrlegal.com
ahalverson@sdrlegal.com

11

CERTIFICATE OF SERVICE

I, Corey B. Rubenstein, an attorney, hereby certify that the foregoing was filed and served on all counsel of record via the Court's CM/ECF system and

Christopher Robertson
Seyfarth Shaw, LLP
Seaport East
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210-2028
crobertson@seyfarth.com
Counsel for Bank of America, NA
Via Email and Federal Express

on this 24th day of November, 2015.

/s/ Corey B. Rubenstein