UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 13 CR 951 |
| | ) | |
| LAURANCE H. FREED | ) | Hon. Robert M. Dow, Jr. |
| | ) | |

**GOVERNMENT'S CONSOLIDATED RESPONSE IN OPPOSITION
TO DEFENDANTS' POST-TRIAL MOTIONS FOR JUDGMENT
OF ACQUITTAL AND FOR A NEW TRIAL**

The UNITED STATES OF AMERICA, by its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, responds to defendant Laurance Freed's motion for a new trial or for a judgment of acquittal (Doc. No. 134), as follows:

## I.     Background

On February 24, 2016, a jury found defendant Laurance Freed guilty of bank fraud in violation of 18 U.S.C. § 1344 (Counts One, Six and Seven), mail fraud in violation of 18 U.S.C. § 1341 (Count Eight), and making false statements to a bank in violation of 18 U.S.C. § 1014 (Counts Ten, Eleven, Fourteen and Sixteen).  The jury acquitted the defendant on the remaining counts, which were bank fraud counts (Counts Two to Five), false statements to a bank counts (Counts Twelve and Thirteen) and a wire fraud count (Count Nine).

As set forth herein, the evidence at trial demonstrated the defendant's guilt beyond a reasonable doubt. Moreover, the defendant has not identified any error that requires a new trial. As a result, the post-trial motions should be denied.

## II. The Government's Evidence at Trial Proved Defendant's Guilt Beyond a Reasonable Doubt, And Thus Defendant's Motion For Judgment of Acquittal Should Be Denied.

### A. Legal Standards for Obtaining a Judgment of Acquittal

The case law governing challenges to the sufficiency of the government's proof at trial is well settled. Motions for acquittal should be granted only where "the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a). A jury's verdict of guilt is entitled "great deference," *United States v. Phillips*, 239 F.3d 829, 842 (7th Cir. 2001), and may be set aside only "if no rational trier of fact could have agreed with the jury." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (*per curiam*). In reviewing the sufficiency of the evidence, the district court should view "all the evidence and draw all reasonable inferences in the light most favorable to the prosecution." *United States v. Villegas*, 655 F.3d 662, 668 (7th Cir. 2011). "An argument that insufficient evidence supported a jury verdict is difficult to win," *id.* at 668, and a district court cannot weigh the evidence or second-guess the jury's credibility determinations. *United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2006).

In other words, the district court should "overturn a guilty verdict only when the record contains *no evidence*, regardless of how it is weighed, upon which a rational trier of fact could find guilt beyond a reasonable doubt." *United States v.*

2

*Starks*, 309 F.3d 1017, 1021 (7th Cir. 2002) (emphasis added).  The jury "is free to choose among various reasonable constructions of the evidence," *id.* at 1022, and "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence."  *Coleman*, 132 S. Ct. at 2062.

    **B.**    **The Defendant's Motion for an Acquittal as to the Fraud Counts (Counts One, Six, Seven and Eight) Should Be Denied.**

        **1.**    **The Jury Rationally Concluded that the Defendant Acted with Intent to Defraud.**

The defendant claims that the Court should acquit him on the fraud counts because there was insufficient evidence to establish that he acted with intent to defraud.  Motion at 1.  After making that claim, the defendant argues that there was insufficient evidence that the executions were in furtherance of the scheme to defraud, but largely ignores the full extent of the fraud scheme that was charged and proved at trial.  Motion at 2-4.  As set forth below, when viewing the evidence in the light most favorable to the government and when considering *all* of the evidence, there was more than sufficient evidence for a rational jury to find that the defendant acted with intent to defraud.  As a result, the Court should reject this invitation to second-guess the jury's conclusion that the defendant acted with intent to defraud.

A conviction for bank fraud under 18 U.S.C. § 1344 or mail fraud under 18 U.S.C. § 1341 requires proof of, among other things, that the defendant acted with intent to defraud.  Seventh Circuit Pattern Jury Instructions (2012), pp. 511 (bank

fraud) and 490 (mail fraud). "Intent to defraud" means that the defendant "acted willfully and with specific intent to deceive or cheat, usually for financial gain for one's self or the causing of financial loss to another." *United States v. Jackson*, 540 F.3d 578, 594 (7th Cir. 2008), quoting *United States v. Lamarre*, 248 F.3d 642, 649 (7th Cir. 2001). The government can prove intent to defraud with circumstantial evidence and by inferences drawn from the scheme itself. *Id*.

As an initial matter, the evidence at trial established that the defendant and his business Joseph Freed and Associates were in dire financial straits between at least 2008 and 2011, which is the time of the charged fraud scheme. Specifically, the evidence showed the following:

- During at least 2008 and 2009, the defendant convened regular cash meetings with JFA executives to discuss JFA's liquidity problems and how to meet the ongoing obligations of the company, *see* O'Donnell Testimony and Stram Testimony;[1]

- Starting in early 2008, Freed began to direct employees to withdraw funds from a bank account for the Streets of Woodfield joint venture with Kimco in order to fund JFA operating expenses, *see* O'Donnell Testimony and GX 8/18/08 Resignation letter;

- Freed did not discuss these withdrawals with Kimco prior to taking the money despite the fact that Kimco owned 45% of SOW, *see* Covey Testimony;

- According to defense witness Linda Stram, JFA initially accounted for these SOW withdrawals in a way that "buried" the transactions at month's end in a category called "A/R unbilled," *see* Stram Testimony;

- JFA later changed the accounting for the SOW withdrawals to describe the as "A/R Affil Eliminating Loan," but according to Christopher Covey and David

---

[1] The government does not have the benefit of trial transcripts. To the extent the government refers to trial testimony, it is paraphrasing the testimony based on the notes and the memory of the undersigned AUSA.

Henry of Kimco, Kimco never agreed to loan any money to the defendant and the defendant never even asked Kimco for a loan, *see* Covey Testimony and Henry Testimony;

- During early September of 2008, JFA's CFO Al O'Donnell resigned from his position at JFA, and notified the defendant in a detailed letter that it was not JFA's extraordinary financial problems that compelled him to resign; instead, his resignation was compelled by "the continued use of partnership cash [O'Donnell testified that he was referring to the use of the SOW/Kimco money] as a funding source for ongoing obligations of the company" and by the "tapp[ing] of real estate tax reserves" which O'Donnell feared would jeopardize JFA's ability to make upcoming real estate tax payments on JFA's real estate developments, *see* O'Donnell Testimony and GX 8/18/08 Resignation letter;

- The defendant, who had a net worth of approximately $95 million, had personally guaranteed more than $300 million of JFA's loans, *see* GX 6/4/09 Status of Loan Modification at 4;

- By November 2008, the defendant stopped making payments on a $105 million line of credit, known as the big line of credit, that JFA had with a bank consortium led by Bank of America, *see* Katunas Testimony;

- JFA did not make any more payments on the big line of credit in late 2008, made no payments at all on the big line of credit during 2009, and ultimately defaulted on the loan, *see id.*; and

- JFA failed to make its second installment of property taxes on a property it owned called Evanston Plaza, which could have led to JFA losing the property through a tax sale. *See* GX 6/19/09 email.

The short of it is that JFA and the defendant—who owned and managed JFA and whose personal wealth was tied to JFA—were in desperate financial shape starting in approximately 2008 when the real estate market was tanking and continuing until at least 2011.

Given his financial condition, the defendant needed more time to keep his many creditors at bay, and more money. That is what motivated the defendant's fraud. The evidence at trial showed that to accomplish these goals, the defendant:

5

(1) lied to Bank of America and the bank consortium about the collateral supporting the big line of credit in an effort to conceal the full extent of JFA's financial issues and obtain an additional $10 million from the banks; (2) lied to the City of Chicago and the banks in order to obtain TIF payments that he was not entitled to; and (3) stole money from joint venture partner Kimco and falsely characterized the withdrawals as loans. In light of the evidence of his major financial problems and his many lies to various partners like Bank of America, Kimco and the City of Chicago, the jury had ample evidence to conclude that he acted with intent to defraud.

The defendant claims that "there were no affirmative misrepresentations" and that this case only involved concealment. Motion at 2-3. The Court should reject this inaccurate claim. During his direct examination, Gary Katunas of Bank of America examined the PowerPoint slides and identified numerous affirmative false statements on those slides.[2] In particular, each slide contained a total representing the "Approx. Proceeds" of the sale of each property, and Katunas explained to the jury why each of those affirmative representations by the defendants was false.[3] As Katunas testified, the representations about the value of the TIF notes were false because the project note was previously pledged to Cole

---

[2] The defendant blames his employee Joe Florczak for creating those slides, but Katunas testified that the defendant was at those presentations and that the defendant spoke consistently with the information reflected on those slides. Thus, pointing the finger at Florczak goes nowhere.

[3] The defendant argues that this representation is mere arithmetic, but it was in fact a representation by the defendant to the bank consortium as to the amount of proceeds that the consortium could expect if the collateral was liquidated.

Taylor Bank.[4]  The defendant himself introduced evidence that Cole Taylor recorded its security interest in the project note.  Motion at 4, fn.2.  Thus, as the government argued at closing, the defendant's representations that the sales value, proceeds, and net proceeds of the TIF notes were over $7.6 million were false because those figures overstated the sales value and proceeds by approximately $2.1 million, which was the value of the project note that had been pledged to Cole Taylor.  And those were not the only false statements during the December 15, 2008 presentation, which was charged as the execution in Count One.  The representations about the costs of sale and proceeds from the sale of SOW were false because by that time the defendant had withdrawn a net total of approximately $3.6 million from SOW to keep JFA afloat, and the representations about the proceeds and cost of sale for Evanston Plaza were false because they did not account for the more than $880,000 in unpaid property taxes on the property.  Adding up those amounts ($2.1 million + $3.6 million + $883,000), the defendant overstated the value of the collateral on December 15, 2008 by approximately $6.58 million.

Notably, all parties agree that at the time of each of those presentations, the defendant knew full well about the double pledge of the project note. Specifically, Bill Krinsky of Cole Taylor put him on notice of Cole Taylor's interest in the note in August 2008, the defendant forwarded the email to his attorney. On August 29,

---

[4] The defendant focuses his argument on the cross-examination Katunas and ignores the direct examination.  But a rational jury was free to credit Katunas' testimony on direct examination and discount the cross-examination.

2008, the attorney advised the defendant by email about the double pledge. GX 8/29/08 email.

Gary Katunas also testified that the meetings with the PowerPoint presentations were akin to loan applications for the additional $10 million loan modification that the defendant was seeking. A review of the presentations reveals that the defendant was providing the bank group with detailed information about JFA's financial condition to allow the banks to assess JFA's suitability for the loan. *See, e.g.*, GX 12/15/08 Presentation. Providing false information on loan applications and other loan documents is classic circumstantial evidence of intent to defraud, and that is what the defendant was doing by lying to the banks about the value of the collateral. *See, e.g., Jackson*, 540 F.3d at 594 ("Falsifying information on loan documents is circumstantial evidence of intent to defraud.")

The defendant's actions after O'Donnell's resignation also shed light on his intent to defraud. After the defendant's longtime CFO notified him that he was resigning due to his concerns about the defendant's continuing use of SOW partnership money and real estate property tax money to fund JFA's operations, the defendant continued those practices unabated. Specifically, after O'Donnell's resignation, the defendant directed his employees to make approximately 30 withdrawals in 2008 and 2009 for a net total of more than $5 million in 2008 and 2009, and he continued to use money that had been collected from tenants to set aside for real estate taxes. *See, e.g.*, GX Summary Charts; Covey Testimony.

The defendant's blatant lies to the City of Chicago also illustrated his intent to defraud. For example, the defendant signed and submitted numerous affidavits to the City of Chicago swearing that (1) the representations and warranties contained in the UGV Redevelopment Agreement are true and accurate; and (2) no default had occurred (regardless of whether any notice of default had been given). *See, e.g.*, GX 2009 Request for Payments (this was the execution for Count Six); 2010 Request for Payments (execution for Count Seven). As set forth below, these representations were obviously false for numerous reasons.

One of the representations and warranties in the UGV Redevelopment Agreement was that JFA was not in default with respect to *any* agreement related to the borrowing of money. *See* GX UGV Redevelopment Ag., pp. 33-34, Section 8(h). Further, a default under the lender financing, which included the Cole Taylor loan, caused a default under the RDA. *See* GX UGV Redevelopment Ag., p. 57, Section 15(h). Not surprisingly, the subsequent pledge of the project note to Bank of America violated a covenant in JFA's loan agreement with Cole Taylor, which was an event of default under that contract. GX Sec. Agr. And Coll. Assign of RDA, p.4, Section 2, (c)(ii) & (v); 9/17/09 3rd Amendment of Loan Docs. at 6. And as set forth above, a default under the Cole Taylor financing caused a default under the RDA.

With that background in mind, the reasons the affidavits were false and that the defendant knew they were false are as follows:

- At the time the defendant signed the affidavit to the City in December 2009, no payments had been made on the big line of credit for over a year. Non-payment of monthly installments on a loan is perhaps the most obvious breach of a loan agreement, and a breach of any loan agreement meant that

the representations and warranties contained in the UGV RDA were not true and accurate.

- The same is true of December 2010. No payments had been made on the big line of credit at that time for over two years. This meant that the representations and warranties contained in the UGV RDA were not true and accurate.

- By the time the defendant signed the affidavit to the City in December 2009, Bank of America had twice provided him written notice of default. GX 1/23/09 Notice of Default; 10/2/09 Notice of Default. Again, this default meant that the representations and warranties contained in the UGV RDA were not true and accurate.

- By the time the defendant signed and submitted the affidavit to the City in December 2010, the City had learned of the double pledge and had sent the defendant a letter demanding that the defendant provide the TIF money he took in early 2010 to Bank of America. GX 4/28/10 Eager Letter.

- The defendant knew about the double pledge of the project note, which caused a default under the Cole Taylor loan and thus a default under the RDA. Though the defendant claims that there was no evidence the defendant understood the "voluminous and abstruse" RDA, it was not irrational for the jury to conclude that the defendant was not a dunce who did not read contracts that meant millions of dollars for his company. Indeed, the defendant was the owner and president of JFA, had years of experience as a developer, was described by his CFO O'Donnell as a very skilled negotiator with banks, and he signed most of the agreements at issue. Further, based on the testimony of O'Donnell and the email traffic between the defendant and his lawyer, it was reasonable for the jury to conclude that the double pledge was a big problem for JFA and that the defendant understood the seriousness of the problem.

The testimony of Bill Krinsky of Cole Taylor also provided telling insight into the defendant's intent to defraud. Krinsky testified that after Cole Taylor learned of the double pledge of the project note, he had discussions with Carolyn Walters and the defendant about it. Krinsky said that Carolyn Walters—in the presence of the defendant—told him that either JFA or Freed were in talks with Bank of America about resolving the double pledge. This was a lie. According to Katunas,

Bank of America did not find out about the double pledge until later, and no one at JFA told them about it.

In light of all this evidence, which includes the (1) the defendant's strong motive to commit fraud in light of his financial problems, (2) the defendant's numerous lies to Bank of America about the value of the big line of credit collateral, (3) the lies to the City of Chicago in order to obtain TIF payments that JFA was not entitled to, (4) the lie to Bill Krinsky of Cole Taylor about the purported talks with Bank of America, and (5) the raiding of millions of dollars of SOW money even after Al O'Donnell's resignation and after the defendant's meeting with Chris Covey of Kimco, it was rational for the jury to conclude that the defendant acted with intent to defraud.

> **2.      The Jury Rationally Concluded that the Defendant Executed the Scheme to Defraud as Charged in Counts Six, Seven and Eight.**

With respect to the executions in Counts Six and Seven, which were bank fraud counts, the defendant argues that the executions could not have possibly furthered any fraud against the banks. The defendant seizes on a comment the government made in closing about the project note possibly being "worthless" to the banks, and claims if the project note was worthless, then the false affidavit could not have furthered the scheme against the banks. Though the defense describes this as a "simple" argument, the government finds it difficult to follow. Regardless, it is not persuasive as a rational jury could have found that the affidavits furthered the fraud scheme against the banks or at the very least against one bank.

The evidence showed that the defendant's purpose in submitting the false affidavits to the City in late 2008, 2009 and 2010 was to obtain money he was not entitled to and to continue to buy time with his many creditors. The affidavits were false for the reasons set forth above.[5] And a rational jury could have reasonably concluded that the TIF notes had potential value for at least Cole Taylor or the bank consortium (both Cole Taylor and the bank consortium were charged as victims of the bank fraud scheme). For example, Freed took the $860,000+ in TIF proceeds in February 2010 based on the false December 2009 affidavit and converted the proceeds to his own use. This defrauded the bank consortium because under the payment direction letter the bank consortium was entitled to the TIF proceeds. GX 6/14/10 Katunas Letter re TIF; 3/10 Harder email; GX 4/28/10 Eager Letter. The false affidavit defrauded Cole Taylor because Cole Taylor also had a claim to the project note proceeds, as (1) the defendant had defaulted on the loan agreement with Cole Taylor due to the double pledge, (2) JFA had pledged the project note to Cole Taylor as collateral for the loan and (3) Walters (in the defendant's presence) lied to Cole Taylor by claiming JFA was in talks with BOA about the double pledge when in fact JFA never told BOA about the double pledge, which bought the defendant time to convert the project note proceeds to his own use without having to worry about Cole Taylor foreclosing on the collateral.

---

[5] The double pledge occurred in November 2007, which meant that the defendant was in default on the RDA from at least that point forward. GX 8/29/08 email.

12

The defendant's emphasis on a comment in closing about the project note possibly being worthless to the banks is misplaced. First, for the reasons set forth above, both Cole Taylor and the banks in the bank consortium had colorable claims for the TIF funds. Second, stepping into the defendant's imaginary world for a moment and assuming that he submitted truthful affidavits to the City, such an affidavit would have alerted the City and the banks to the full extent of the defendant's double-dealing, deception and lies. Katunas testified that the defendant's false statements to BOA and bank consortium were important because had they known about the defendant's lies sooner, the banks would have sought to foreclose sooner and mitigate their losses. A truthful affidavit to the City would have provided a laundry list of reasons why the representations and warranties in the RDA were not true and accurate, and explained that default had occurred for numerous reasons, as set forth above. And even if it did not provide such detailed explanations, a simple affidavit admitting default under the RDA and admitting that the representations and warranties were false could have reasonably caused the banks to investigate further and learn about the full scope of the defendant's fraud. Given that the defendant was knee deep in financial problems and keeping afloat by committing fraud, and considering that JFA had $700 million in outstanding loans to BOA and the bank consortium, the last thing he wanted was more pressure from the banks. Accordingly, the affidavits submitted by defendant also furthered the scheme to defraud by ensuring that the City and the banks did not discover his scheme.

The defendant's backup argument is the jury could not have reasonably concluded that the defendant knew the affidavits charged in Counts Six, Seven and Eight were false. The Court should reject this weak argument, which totally fails to take into account the standard of review on a motion for a judgment of acquittal. As set forth above, the jury could have reasonably concluded that a sophisticated, experienced owner and president of a major real estate development company who was a very skilled negotiator with banks and who signed most of the agreements at issue actually read the agreements, read the notices of default, understood the terms, and knew that the affidavits were false.

Moreover, at the time the defendant signed the affidavits charged as the executions in Counts Six (December 2009), Seven (December 2010) and Eight (December 2009), the defendant had already admitted to Cole Taylor *in writing* that JFA had defaulted on the UGV loan with Cole Taylor due to the double pledge. *See* 5/20/09 2nd Amendment of Loan Docs, p.6 (admitting that the double pledge amounted to an "Event of Default" under loan documents with Cole Taylor); 9/17/09 3rd Amendment of Loan Docs, p.6 (same). There was plenty of evidence from which the jury could reasonably conclude that the defendant knew the affidavits were false.

**3.   The Jury Rationally Concluded that the Defendant Made Knowingly False Statements as Charged in Counts Fourteen and Sixteen.**

**a.   Count Fourteen**

The defendant next challenges the jury verdict on the false statement charge in Count Fourteen.  He notes that 18 U.S.C. § 1014 prohibits the making of a "false statement or report," but does not explicitly prohibit the making of a false promise, in contrast to the mail, wire and bank fraud statutes, which explicitly prohibit false or fraudulent promises.  The defendant claims that the underlying basis for Count Fourteen is at best a false promise.   The critical language underlying Count Fourteen stems from the amended loan agreement between the defendant's Uptown Goldblatt's Venture and Cole Taylor, which provided as follows: "The Borrower and Co-Borrower [the defendant's UGV entities] covenant and agree to provide to [Cole Taylor] a release and termination of the [pledge of the project note to BOA] by no later than October 31, 2009."   GX 9/17/09 3rd Amendment of Loan Docs, ¶7(b). According to the defendant, this was not a statement at all, and thus no reasonable jury could have convicted him on Count Fourteen.  As set forth below, the Court should reject this argument.

The defendant's argument is based on the Supreme Court's decision in *Williams v. United States*, 458 U.S. 279 (1982).  That case involved a check-kiting scheme in which the defendant passed worthless checks between numerous banks in a short period of time.  *Id.* at 283-84.  The government asserted that the non-sufficient funds checks were the false statements in that case because a drawer is

understood to represent that he currently has funds on deposit sufficient to cover the face value of the check. *Id*. at 285. The Court disagreed, and explained that "a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false.'" *Id*. at 284.

A number of courts have recognized that *Williams* does not stand for the proposition that a promise cannot be a statement. For example, the Fifth Circuit thoroughly and persuasively analyzed this issue in *United States v. Shah*, 44 F.3d 285 (5th Cir. 1995), in a case involving a statement that the defendant "will not disclose" certain price information related to a contract. *Id*. at 289.[6] The defendant in *Shah*, like the defendant in this case, claimed that the language at issue was not an assertion that could be proved true or false; it was simply a prediction of future performance. *Id*. at 289-290. The Fifth Circuit rejected the argument:

> *Williams* does not directly confront the issue presented in this case. Simply put, the issue in *Williams* was whether a check makes a statement at all and, if so, what statement. Although the Court could not agree with the government about what exactly a check implicitly represents, there is no dispute in this case as to what Shah stated and thereby clearly implied. Contrary to Shah's suggestion, the Supreme Court did not hold that a check was a promise and therefore not a statement. *Williams* neither mentioned nor pursued a distinction between statements and promises. The Court never suggests that a promise cannot, as a matter of law, be or contain a statement or representation. Instead, a check is not a statement because it is not "a factual assertion," because it does not "make any representation as to the state of petitioner's bank balance." *Id*. at 285, 102 S.Ct. at 3091. By relying on *Williams* for the proposition that a promise is not a statement, Shah begs the very question at issue: whether the

---

[6] The *Shah* case involved 18 U.S.C. § 1001, which prohibits "false, fictitious or fraudulent statements or representations" on matters within the jurisdiction of federal agencies. Despite the different statute, the issue in that case was materially the same as the issue raised by the defense in this case.

> statement at hand is capable of being termed true or false; whether, in other words, a promise can be construed as "a factual assertion."

*Id*. at 291.

Relying on case law and the Restatement of Torts, the Fifth Circuit ultimately rejected the defense position because a promise implies an intent to perform, the absence of which may make a promise false when stated. *Id*. at 291. The court held a promise may amount to a "false, fictitious or fraudulent" statement "if it is made without any present intention of performance and under circumstances such that it plainly, albeit implicitly, represents the present existence of an intent to perform." *Id*. at 294. Turning to the facts of the case in *Shah*, the Fifth Circuit then denied the motion for a new trial, noting that whether a defendant intended to perform was a question of fact for the jury and concluding that circumstantial evidence supported the jury's finding. *Id*. at 294-95. *See also United States v. Stewart*, 590 F.3d 93, 119-20 (2d Cir. 2009) (distinguishing *Williams* and upholding conviction for false statements under 18 U.S.C. § 1001 where defendant stated that she would ("shall") abide by certain conditions and where jury could have reasonably concluded that defendant had no present intention to abide by conditions when she made the statement); *United States v. Elliott*, 771 F.2d 1046, 1050 (7th Cir. 1985) (upholding conviction of the defendant-applicant under 18 U.S.C. § 1001 where defendant claimed he had changed his mind after filling out the application); *Elmore v. United States*, 267 F.2d 595, 603 (4th Cir. 1959) ("In practical effect, a false promise fraudulently given amounts to a

17

false statement of an existing intent and it can be as destructive as the false statement of a material fact.")

In this case, it was not irrational for the jury to conclude on the basis of circumstantial evidence that the at time Freed signed the Third Amendment of the Loan Documents with Cole Taylor, he had no intention of obtaining a release and termination from BOA by October 31, 2009. As noted above, Carolyn Walters—in the presence of the defendant—told Bill Krinsky of Cole Taylor that either JFA or Freed were in talks with Bank of America about resolving the double pledge. This was a lie, as the defendant never even told BOA about the double pledge.[7] Given this lie, the jury could have reasonably inferred that the defendant was lying to Cole Taylor both in person and in the loan documents to keep Cole Taylor at bay and keep the bank group in the dark about the double pledge, while at the same time attempting to obtain more money from the bank group. Indeed, as of July 2009, the defendant was still meeting with the bank group in efforts to obtain the $10 million loan modification, GX 7/16/09 Presentation, and Bank of America did not give a final notice of default making the entire amount of the big line of credit due until October 2009, which was after the defendant made the statement at issue in Count Fourteen.

---

[7] The government does not recall if Krinsky testified about *when* this conversation occurred, though it had to have been after Cole Taylor learned about the double pledge, which was during approximately the summer of 2009. See GX 8/21/09 Memo; 6/15/09 to 6/24/09 Krinsky/Arnold/Kulat Email. Regardless of whether the conversation occurred before or shortly after execution of the Third Amendment of Loan Documents, the lie to Cole Taylor shed light on the defendant's state of mind with respect to the Third Amendment of Loan Documents.

In considering whether the defendant had any intention of obtaining the release by October 31, 2009, the jury could have also reasonably considered that the defendant had previously agreed to obtain the release by August 20, 2009, GX 2nd Amendment of Loan Docs. at 7, and had not obtained it and had not even discussed it with BOA by that time. It could have further considered that he did not even obtain the release by the time specified in the Fourth Amendment of Loan Documents. GX 9/28/10 4th Amendment of Loan Documents. Given the other evidence presented in this case, the jury could have also considered that the defendant was not in a financial position at the time of the Third Amendment of the Loan Documents to be able to offer anything of value to BOA in order to replace the project note as collateral on the big line of credit, and thus had no intention of approaching BOA to obtain a release and termination by October 31, 2009.[8]

For all of these reasons, it was not irrational for the jury to convict the defendant on Count Fourteen.

### b.    Count Sixteen

The defendant makes a similar argument with respect to Count Sixteen. Specifically, the defendant claims that the basis for Count Sixteen was neither a statement nor a promise. The language underlying Count Six is from the amended and restated loan agreement between the defendant's SOW entity and BOA, which

---

[8] At trial and in his motion, the defendant emphasizes that it would have been possible for the defendant involve a third party other than the bank group to obtain the release. That is possible but the jury was not required to credit that possibility. Given the evidence in this case, the jury could have reasonably concluded that the defendant would have advised BOA of the double pledge and entered negotiations with BOA about the issue if he had any intention of obtaining the release.

provided as follows: "Borrowers [defendant's SOW entities] may make Distributions provided that, in the case of each Distribution . . . (iii) [SOW entities] cash and cash equivalents remaining after such Distribution shall be not less than an amount equal to the aggregate of (A) the total amount of the security and other deposits received by [SOW entities] from the tenants of the Premises, (B) an amount sufficient to provide for the real estate taxes on the Premises to be paid in the current year in which such Distribution occurs. . . and (C) a reasonable working capital reserve."  GX 4/2/09 Amended and Restated Construction Loan Agreement, ¶ 8.13(iii). According to the defendant, no reasonable jury could have convicted him on Count Sixteen because the above-referenced language from the contract was not a statement.  As set forth below, the Court should reject this argument.

The language at issue amounted to an agreement by the defendant to only take distributions from SOW if those three conditions were met.  And the evidence overwhelming showed that he had no present intention of abiding by that agreement.  Indeed, as set forth in GX SOW Balance Sheets, the SOW had total cash of less than $20,000 as of March 31, 2009.  *See id.* at 11.  Three days later, on April 2, 2009, the defendant agreed to only take distributions if those three conditions were present.  The *next* day, on April 3, 2009, the defendant directed $273,000 to be withdrawn from the SOW.[9]  Moreover, as noted by Chris Covey, the financial records showed that the defendant was taking regular and repeated

---

[9] O'Donnell testified that all withdrawals from the SOW partnership accounts by JFA were personally authorized by the defendant.

withdrawals from the SOW both before and after he made that statement on April 2, 2009, which were substantially depleting the SOW of cash. The government's recollection is that Covey also provided an estimate of the real estate taxes for SOW, and that the financial records showed that there was nothing close to that amount in cash after the defendant's withdrawals, let alone additional money for a reasonable working capital and security deposits. *See* Covey Testimony; GX Balance Sheets; GX Summaries.

Given the defendant's numerous and repeated withdrawals from the SOW accounts before and after defendant signed the amended and restated loan agreement, there was more than sufficient evidence for the jury to infer that the defendant did not intend to limit his distributions as provided by the agreement. Accordingly, there was sufficient evidence to support the jury's verdict as to Count Sixteen.

### III. The Motion for a New Trial Should be Denied.

The defendant makes two brief arguments in support of his motion for a new trial. Both arguments should be rejected.

### A. Instruction re Fraud by Concealment Theory

The defendant seeks a new trial based on the following jury instruction provided by the Court, "A materially false or fraudulent pretense, representation, or promise may be accomplished by the concealment of material information." This is a pattern jury instruction that all parties agree is a correct statement of the law. Pattern Seventh Circuit Jury Instruction (2012), p. 493. In fact, the pattern

provides that the false pretenses/representations/promises can be accomplished by *omissions* and concealment of material information. The Court deleted the reference to omissions at the defendant's request, and the government did not object. Not satisfied with the Court granting its request to delete the word omissions from the pattern, the defendant still claims that the jury could have been confused by the pattern instruction into convicting on a fraud-by-omission theory. The defendant cites no case law in support of his argument. If the government recalls this exchange at the jury instruction conference correctly, the government brought a Seventh Circuit case on this issue to the conference and suggested that if any additional language was added to the pattern, it should come from the Seventh Circuit case. The defense did not like the language from the Seventh Circuit case and as a result the Court did not add it. It was not error for the Court to instruct the jury using the pattern instruction, which all parties agree is an accurate statement of the law, particularly considering that the Court addressed the defendant's concern by deleting the omission language from the pattern.

### B.    Unanimity Argument

The defendant also preserves a unanimity argument for appeal. He acknowledges that his argument is foreclosed by Supreme Court precedent. *See United States v. Dunn*, 284 U.S. 390, 393 (1932) (holding that "consistency in the verdict is not necessary" and that "[e]ach count in an indictment is regarded as if it was a separate indictment."). The Court should reject the unanimity argument, consistent with binding precedent.

## IV.    Conclusion

For these reasons, the Court should deny the defendant's motion for a judgment of acquittal and for a new trial.


Dated: May 17, 2016                              Respectfully submitted,

                                                 ZACHARY T. FARDON
                                                 United States Attorney

                                        By:      /s/ Matthew F. Madden
                                                 RENATO MARIOTTI
                                                 MATTHEW F. MADDEN
                                                 JESSICA ROMERO
                                                 Assistant United States Attorneys
                                                 219 South Dearborn Street
                                                 Chicago, Illinois 60604
                                                 (312) 886-2050