**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 13 CR 951 |
| v. | Honorable Robert M. Dow, Jr. |
| LAURANCE H. FREED | |

**DEFENDANT'S REPLY IN SUPPORT OF HIS POST-TRIAL MOTIONS**

Defendant Laurance H. Freed submits the following reply to the government's response to his post-trial motions:

I.   Alleged Concealment of the Double Pledge of the Project Note

   A.   False Statements under § 1014 (Counts Ten and Eleven)

The government's response does not take issue with the critical distinction between the offense of bank fraud and the offense of making a false statement to a bank: Although a fraud charge can be premised upon statements that are literally true but misleading, a false statement charge may only be premised on affirmative statements that are, in and of themselves, literally false – regardless of whether they are misleading or so-called "half-truths." The government does not address the cases defendant cites, *Staniforth* and *Rahman*, holding that a "misleading statement" is not sufficient for a false statement conviction. (*See* Mot., p. 5.) Because the uncontradicted evidence at trial was that the financial data provided in the slide presentations regarding the UGV project note were literally true, the convictions on those counts cannot survive.

The government points to no evidence that the financial figures concerning that piece of collateral were literally false. In particular, the government does not contest Mr. Katunas' acknowledgement during cross-examination that each of those figures accurately reflected the

particular line items on the slide. Instead, without pointing to any specific testimony, the government implies that Mr. Katunas gave different testimony on direct examination, and it argues that the jury was free to credit that testimony and discount the cross-examination. But none of his direct examination testimony was inconsistent with his later acknowledgments concerning the literal truth of the data that was presented. His direct examination testimony was that the double pledge should have been disclosed to BoA somewhere on that slide, or through some other mechanism (in other words, it was misleadingly concealed). But his admissions that each and every line item on that slide was accurate are unrebutted.[1] The government's effort to mock "defendant's argument" that the bottom line figure on that slide ("net proceeds") was simple arithmetic ignores this key point: Katunas himself acknowledged exactly that, again without any contradiction anywhere else in his testimony or in the trial record at large.

Therefore, regardless of whether the failure to disclose the existence of the double pledge could be deemed fraudulent in light of the statements made, the particular charged statements were not themselves false. The verdicts on Counts Ten and Eleven should not stand.

B.  Bank Fraud (Count One)

The government only tangentially addresses defendant's argument that the jury instructions were inadequate because they did not define fraud by "concealment" as opposed to fraud by "omission."[2] In doing so, the government incorrectly states that "all parties" agreed

---

[1] Like the government, defendant does not have access to the trial transcripts. To the extent Mr. Katunas characterized the slide as "untrue" because it did not reflect the double pledge, the entirety of his testimony made clear that his conclusion was based on the misleading effect of concealing the double pledge, not on the literal falsity of any individual line item or piece of data regarding the project note.

[2] The government again appears to concede that it would have been impermissible for a jury to convict based on any theory of "fraud-by-omission" because, as discussed during the jury

2

that the pattern instruction was an accurate statement of the law. In fact, defendant specifically argued that the pattern instruction was insufficient because it failed to define "concealment" to require an affirmative effort to hide information.

Most of the government's response instead focuses on the issue of defendant's purported intent to defraud BoA regarding the later-discovered double pledge. The government asserts that sufficient circumstantial evidence of defendant's intent exists to support the verdict. The government, however, then points to a litany of evidence that has nothing to do with whether defendant fraudulently intended to conceal the double pledge of the project note. For example, it spends three pages on his supposed financial motive (that his businesses were in "dire financial straits") but financial motive by itself does not prove criminal intent beyond a reasonable doubt. The government also points to evidence concerning *other* supposed wrongdoing caused by defendant, including withdrawals of funds from the Streets of Woodfield account, supposedly false affidavits to the City of Chicago, and the real estate tax delinquencies for unrelated collateral. Neither that evidence nor any other evidence the government enumerates supported a finding that defendant intended to defraud BoA by concealing the existence of the double pledge of the project note.

The undisputed evidence – testimonial and email communications – was that defendant never directed anybody to conceal or misrepresent the fact of the prior pledge of that TIF note. In making this point in his motion, defendant was not "blaming" any employees. Counsel were simply demonstrating that defendant did not create the slide that is the basis for the execution of the charged fraud, nor did he direct anybody to conceal any information on that slide or in any other communication. Absent proof that defendant created or directed a concealment through

---

instruction conference, the government did not allege such a fraud and agreed not to pursue such a theory.

3

that execution, there was no basis for a rational jury to find beyond a reasonable doubt that defendant's purpose was to defraud BoA regarding the prior pledge. Indeed, the Project Note's value was such a small percentage of the total value of the collateral supporting that loan (a mere 1-2%), and the financial data concerning that note was such a small part of the voluminous other information on the slides presented to BoA, that any finding that defendant intended to defraud concerning the double pledge would have to be based on speculation, not evidence or reasonable inferences from the evidence. The jury's acquittal on nearly identical executions in Counts Two, Three, and Four only strengthens the conclusion that any finding of fraudulent intent regarding defendant's failure to disclose the double pledge was based, not on sufficient evidence, but on speculation.[3]

II.   Alleged False Payment Affidavits to the City (Counts Six, Seven, and Eight)

Defendant has shown that even if assumed to be false, the affidavits defendant submitted to the City for payment under the TIF notes did nothing to further any fraud against the banks, as charged in Counts Six and Seven. The government conceded as much at trial – by arguing that the TIF notes had become worthless to the banks because of the breaches of the loan agreements, which in turn constituted breaches of the Redevelopment Agreement with the City. The government cannot have it both ways. If the notes were worthless to the banks because of the breaches of the banks' own loan agreements, then the alleged failure to disclose those breaches *to the City* cannot have furthered any scheme *against the banks*.

The government misportrays defendant's argument as seizing on a single comment by the government that the TIF notes might "possibly be worthless." In fact, as counsel recall and their

---

[3] This is true even if an inconsistent verdict is not a *per se* or stand-alone basis for relief – a separate argument that defendant preserved in his motion.

4

notes reflect, the government argued in *each* of its closing argument and its rebuttal argument that the notes *were* worthless because of the loan breaches, with no qualifications attached. The government's position at trial was *not* that the banks had "colorable claims" to the TIF funds; it was that defendant's loan breaches destroyed the ability of any party – the banks included – to require the City to make those payments.

Even apart from those comments by the government, the evidence does not support that the alleged false affidavits to the City furthered a scheme against the banks. Because advising the City of its right to terminate the TIF payments could not possibly have benefitted the banks, failing to advise the City of those breaches could not have furthered any fraud against the banks. Indeed, both sets of banks declared defaults under their respective loan agreements in the first half of 2009 – during the period of the alleged scheme and prior to the remaining pay requests under the TIF notes. Neither advised the City of those defaults, and neither demanded that the City make the TIF payments directly to them as a result of those defaults. (The most logically plausible explanation for this is that the banks also desired that the City not be aware of those defaults because they understood that the City could stop paying on the notes entirely.)

The government's speculation that a truthful affidavit to *the City* would alert *the banks* to a fraud on them is without any support. Untethered to any evidence, the government asserts that "a truthful affidavit to the City would have provided a laundry list of reasons" why the Redevelopment Agreement was in default. (Resp., p. 13.) The uncontradicted evidence at trial was that the payment affidavit was a form created by the City either to be signed and submitted as is – or simply not to be submitted at all. If there was a breach under the Redevelopment Agreement, then no affidavit would be submitted and no payment would be made. But in neither case would the submission or non-submission of the affidavit further any fraud against the banks.

5

Defendant's motion has also shown, with respect to Counts Six, Seven, and Eight, why there is insufficient evidence that defendant believed the affidavits to be false. In particular, the language of the form affidavits does *not* state that there was no default under the loan agreements with the banks – only that there was no default under the Redevelopment Agreement with the City. The government responds that defendant nevertheless knew that a breach of the loan agreements was a breach of the Redevelopment Agreement, and it points to two facts in supposed support of that conclusion. First, the government points to defendant's status as a sophisticated businessman who signed numerous transactional documents. Second, the government lists evidence that defendant knew that the loan agreements were in default. (Resp., p. 14.)

As to the first point, defendant's status a sophisticated executive who regularly signs numerous contracts does not support a reasonable inference that he knew all of the intricate terms of each of those contracts – especially details from many years earlier regarding non-core terms. (Defendant signed the Redevelopment Agreement in 2002, at least five years before he signed the payment affidavits charged as part of the alleged scheme.) There was no evidence that, at the time he signed those affidavits, defendant understood that a breach of a banking relationship also constituted a breach of the Redevelopment Agreement with the City. The government's second category of evidence on this topic – defendant's knowledge that the loan agreements themselves had been breached – cannot support a finding that defendant also knew that there was a breach of the Redevelopment Agreement. Otherwise, criminal liability for signing business documents would be converted to a standard of negligence or even strict liability based on nothing more than the signor's status.

6

III.     Alleged False "Promises" under § 1014 (Counts Fourteen and Sixteen)

The commercial contract terms at issue in each of these counts – contrasted with the uncharged historical representations and warranties in those agreements – are not "factual statements" under the narrow parameters of § 1014.  As defendant described in his motion, those parameters are much narrower than those of the bank, mail, or wire fraud statutes, each of which has been interpreted to allow for liability based on "promissory frauds."  The government responds by citing to cases interpreting an entirely different statute, 18 U.S.C. § 1001.  But that comparison is flawed.  Whereas § 1014 is limited by its terms to "false statements or reports," the terms of § 1001 are significantly broader, prohibiting "any materially false, fictitious, *or fraudulent* statement or representation" (in that case, to a federal agency as opposed to a bank).  In other words, as the cases cited by the government hold, "promissory fraud" is simply one type of fraud within the scope of that particular statute.

That conclusion, however, does not extend to a pure false statement statute, such as § 1014, which contains no prohibition against fraud.  The government's attempt to distinguish *Williams v. United States*, 458 U.S. 279 (1982), must thus fail.  Contrary to the government's assertion, *Williams* did rely on the fact that a check constitutes a "promise" – in that case, a promise to pay.  *Id.* at 285 (noting that a check "contains an unconditional promise" to pay).  The Court held that even though containing a "promise," the check cannot be deemed a "statement" as the term is narrowly used in § 1014.  That was true even if the defendant had no intention to keep his promise.

Because *United States v. Shah*, 44 F.3d 285 (5th Cir. 1995), and each of the other cases cited by the government were interpretations of § 1001 and not § 1014, their commentary regarding *Williams* provides no help.  *Cf. id.,* 290 (Shah made a "false and fraudulent"

7

statement). Indeed, as those cases noted, *Williams* was noteworthy for recognizing that Congress intended a limited reach of § 1014. Moreover, the government does not attempt to address the holding in the other case cited by defendant, *Rothhammer*, reversing a conviction under § 1014 based on the defendant's contractual promise to pay contained in a promissory note.

Because neither of the charged "false statements" in these counts were statements at all, but were instead commercial terms relating to future actions, the evidence was insufficient to sustain those convictions.

IV. Conclusion

The Court should enter judgment in defendant's favor on each of the counts of conviction. With respect to Counts One, Six, Seven, and Eight, the Court should alternatively order a new trial.

Dated: May 24, 2016					Respectfully submitted,

							LAURANCE H. FREED

							By: /s/ Corey B. Rubenstein
								One of His Attorneys

Mark L. Rotert
Corey B. Rubenstein
Andrea C. Halverson
STETLER, DUFFY & ROTERT, LTD.
10 S. LaSalle Street
Suite 2800
Chicago, Illinois 60603
(312) 338-0200
mrotert@sdrlegal.com
cruben@sdrlegal.com
ahalverson@sdrlegal.com

## **CERTIFICATE OF SERVICE**

      I, Corey B. Rubenstein, an attorney, hereby certify that the foregoing was filed and served on all counsel of record via the Court's CM/ECF system on this 24th day of May, 2016.

/s/ Corey B. Rubenstein